# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| ROSE DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No.: 1:04-CV-268 |
| | ) | |
| ANTHONY J. PRINCIPI, SECRETARY, | ) | |
| DEPARTMENT OF VETERANS | ) | |
| AFFAIRS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF OPINION AND ORDER

This matter is before the court on the Motion for Summary Judgment filed by the Defendant, Anthony J. Principi, Secretary of the Department of Veterans Affairs (hereinafter "VA") on August 24, 2005.  After having moved for and been granted an extension of time in which to do so, Plaintiff Rose Davis (hereinafter "Davis") filed a response in opposition to the motion on December 27, 2005, and the VA filed a reply on January 10, 2006.  For the reasons discussed herein the motion is GRANTED .

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim.  *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir. 1990).  Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and in which that party will bear the burden of proof at trial."
*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552-53 (1986).  The standard for
granting summary judgment mirrors the directed verdict standard under Rule 50(a), which
requires the court to grant a directed verdict where there can be but one reasonable conclusion.
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511 (1986).  A scintilla of
evidence in support of the non-moving party's position is not sufficient to successfully oppose
summary judgment; "there must be evidence on which the jury could reasonably find for the
plaintiff."  *Id.* at 2512; *In Re Matter of Wildman*, 859 F.2d 553, 557 (7th Cir. 1988); *Klein v.
Ryan*, 847 F.2d 368, 374 (7th Cir. 1988); *Valentine v. Joliet Township High School District No.
204*, 802 F.2d 981, 986 (7th Cir. 1986).  No genuine issue for trial exists "where the record as a
whole could not lead a rational trier of fact to find for the nonmoving party."  *Juarez v.
Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 322 (7th Cir. 1992) (quoting *Matsushita
Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356
(1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the
motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories,
and admission on file, together with the affidavits, if any, which demonstrate the absence of a
genuine issue of material fact."  *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553.  The non-moving
party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but
reliance on the pleadings alone is not sufficient to withstand summary judgment.  *Goka v.
Bobbitt*, 862 F.2d 646, 649 (7th Cir. 1988); *Guenin v. Sendra Corp.*, 700 F. Supp. 973, 974 (N.D.
Ind. 1988); *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.), *cert. denied*, 464 U.S. 960

2

(1983).

In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. *Anderson*, 477 U.S. at 249-251, 106 S. Ct. at 2511. However, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. *Mason v. Continental Illinois Nat'l Bank*, 704 F.2d 361, 367 (7th Cir. 1983).

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Id.* 477 U.S. at 248, 106 S. Ct. at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. Fed. R. Civ. P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S. Ct. at 1356; *First National Bank of Cicero v. Lewco Securities Corp.*, 860 F.2d 1407, 1411 (7th Cir. 1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.* A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252, 106 S. Ct. at 2512.

**DISCUSSION**

Plaintiff Rose Davis filed an "Employment Discrimination Complaint" on July 19, 2004.[1]

Davis, an African American woman, was employed as a temporary file clerk at the VA's facility

in Fort Wayne, Indiana, from November 18, 2002, until her termination from that job on March

26, 2003.  The VA contends that Davis was terminated "for failure to perform assigned duties in

an acceptable manner."  Memorandum in Support of Motion for Summary Judgment

("Memorandum in Support"), Docket at 23-1, p. 2.  The parties do not dispute that Davis was

terminated prior to the end of her temporary period of employment.  Davis, however, alleges that

the VA's proffered reason for her termination was pretextual.  Davis argues that she was, in

reality, the victim of race discrimination.[2]

Davis began her employment with the VA on November 18, 2002.  According to her

Complaint, during the four-month period she worked for the VA, Davis was subjected to

"harassing treatment" by "two white co-workers" and was "assaulted" by one white co-worker.

Complaint, Docket at 4, p. 2.  Davis further alleges that she "notified the [VA] on several

occasions" about this mistreatment.  *Id.*  Ultimately, Davis was terminated on March 26, 2003,

---

[1] Davis's Complaint was filed *pro se*.  On March 24, 2005, an attorney filed an appearance on behalf of Davis.  On October 3, 2005, another attorney (with the same law firm) filed a notice of substitution of counsel, and he has represented her in this case since that date.

[2] In her Complaint, Davis asserted claims for race discrimination, retaliation, and disability discrimination.  Complaint, Docket at 4, p. 2.  However, in her response to the motion for summary judgment, Davis concedes that "she has legally insufficient evidence to withstand Defendant's Motion for Summary Judgment as to her retaliation and Rehabilitation Act claims."  Plaintiff's Response in Opposition to Motion for Summary Judgment ("Plaintiff's Response"), Docket at 28, p. 1, n. 1.  Accordingly, those claims will not be discussed in this Order, except to the extent that certain facts presented by Davis with regard to those claims may be relevant to other claims or issues in the case.

for what the VA contends was a failure to perform her work properly, despite the VA's alleged attempts to assist her in improving her performance. *See, e.g.*, Memorandum in Support, p. 2.

Following her termination, Davis filed a complaint with the Office of Employment Discrimination Complaint Adjudication of the VA. Following an investigation, that office found no evidence of discriminatory treatment with regard to Davis's treatment on the job or her termination, and dismissed her complaint on June 9, 2004. Complaint, Docket at 4, Exhibit 1. Approximately one month after the dismissal of her EEO complaint, Davis filed the current action in this court.

The VA argues that Davis's Complaint should be dismissed because: 1) she failed to exhaust her administrative remedies; and 2) she fails to present sufficient evidence to prove (or at least raise a genuine issue of fact) that the VA's proffered, non-discriminatory reason for terminating her was pretextual. Defendant's Memorandum in Support, p. 1. The court need not address the first argument. That is because it relates only to Davis's charges of retaliation and disability discrimination, which she agrees are unsupported by the evidence. In other words, the dismissal of those claims is uncontested.

The second argument presented by the VA goes to the heart of Davis's remaining claim–that of race discrimination. The VA contends that the evidence put forth by Davis simply fails to raise a genuine issue of material fact concerning the VA's proffered reason for terminating her.[3]

---

[3] In its Memorandum in Support, the VA actually states that it is entitled to summary judgment because Davis "fails to state a claim upon which relief can be granted . . . ." Memorandum in Support, p. 1. Of course, this matter is before the court on the Defendant's motion for summary judgment, not a motion to dismiss under Fed.R.Civ.P. 12(b)(6). But this is more a matter of semantics. The crux of the VA's argument is, clearly, that Davis simply fails to

It is well established that a plaintiff asserting a discrimination claim under Title VII must come forth with direct evidence of discrimination or, having failed that, proceed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and its long line of progeny.  Davis does not assert that she has direct evidence of race discrimination.[4]  Rather, she claims that her evidence, viewed in its entirety, creates an inference or fact issue with regard to her race discrimination claim.

Under the burden-shifting method of *McDonnell Douglas*, a Title VII plaintiff must first establish a prima facie case of discrimination.  This means she must show that: 1) she belongs to a protected class; 2) she was performing her job in a satisfactory manner; 3) she suffered an adverse employment action; and 4) similarly situated employees not in the protected class were treated more favorably.  *See, e.g., Stone v. City of Indianapolis Public Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002).  Obviously, Davis succeeds on the first and third prongs of the prima facie test, and the VA concedes that.  But the VA adamantly argues that Davis cannot succeed on the second and fourth points.  The VA contends that the evidence clearly demonstrates that Davis was simply *not* performing her duties as expected and was terminated for that reason and that reason alone.

Assuming a plaintiff can establish a prima facie case of discrimination, the game is not over.  That merely shifts the burden to the defendant employer who must then come forward with a legitimate, nondiscriminatory basis for the action it took against the plaintiff.  Again, in

---

successfully challenge its proffered, nondiscriminatory reason for terminating her.

[4] In fact, Davis concedes that she "does not have any direct evidence of disparate treatment in this case, and must consequently proceed under the indirect method of proof." Plaintiff's Response, Docket at 28, p. 9.

this case, it is Davis's alleged failure to perform her duties properly that the VA claims resulted in her termination.  Finally, once the defendant has articulated a nondiscriminatory reason for its decision, the burden shifts once more to the plaintiff who must present sufficient evidence to cast doubt on that reason.  That is, she must at least raise a fact issue as to whether the defendant's proffered reason is pretextual.  This step is no easy task, since "pretext . . . means a lie, a specifically phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995).  Merely casting doubt on an employer's stated reason for an adverse employment action is not enough to establish that the reason was pretext.  Rather, "to avoid summary judgment, a plaintiff must present evidence showing that the employer did not honestly believe his proffered reason." *Hague v. Thompson Distribution Company*, 436 F.3d 816, 825 (7th Cir. 2006) (citation omitted).

Davis points out in her response brief that "[t]he Seventh Circuit has observed that where, as here, the second prong of the prima facie case and the question of pretext focus on the same set of circumstances, the case should be scrutinized with respect to the matter of pretext." Plaintiff's Response, p. 10 (citations omitted).  Davis is correct that when the issue of job performance is at the heart of the dispute between the employer and the former employee, the Seventh Circuit has determined that the second (and also usually the fourth) prong of the prima facie test is merged with the issue of pretext.  The Seventh Circuit recently explained the situation as follows:

> Here, the employer maintains that the plaintiffs were not qualified for the position (the second prong of the prima facie case) and that it fired the plaintiffs for a legitimate non-discriminatory reason. The plaintiffs respond by arguing that the employer is lying about both its business expectations and about the proffered reasons for their termination.  Normally a court should first determine if a plaintiff has established a prima facie case before subjecting the employer to the

7

pretext inquiry.  *Peele v. Country Mut. Ins. Co.,* 288 F.3d 319, 327 (7th Cir.2002) (quoting *Coco v. Elmwood Care, Inc.,* 128 F.3d 1177, 1178 (7th Cir.1997) ("[I]f a plaintiff fails to demonstrate that he was meeting his employer's legitimate employment expectations, the employer may not be 'put to the burden of stating the reasons for his termination.'")).  However, if the plaintiffs argue that they have performed satisfactorily and the employer is lying about the business expectations required for the position, the second prong and the pretext question seemingly merge because the issue is the same--whether the employer is lying. *See Coco,* 128 F.3d at 1179 ("The defendant's expectations are not legitimate if they are phony; so if they are argued to be phony, the issue of legitimate expectations and the issue of pretext seem to merge.").  The plaintiffs still must meet their burden.  *Id.*  However, when faced with this same situation in *Rummery v. Ill. Bell Tel. Co.,* 250 F.3d 553, 556 (7th Cir.2001), we reasoned that "[b]ecause the issue of satisfactory job performance, which lies at the heart of this dispute, must be analyzed in detail at both stages of the *McDonnell Douglas* test, it is therefore simpler to run through that analysis only once."  *See also Gordon v. United Airlines, Inc.,* 246 F.3d 878, 886 (7th Cir.2001).  Accordingly, as in *Rummery,* we focus on the question of pretext, while keeping in mind that if the plaintiffs did not present sufficient evidence of pretext, they also did not show that they were meeting their employer's expectations.

*Hague*, 436 F.3d at 822-23.  In the present case, the determinative issue before the court clearly revolves around the facts and circumstances pertaining to Davis's job performance, or lack thereof, and whether the VA lied about firing her because of her unacceptable work.  Therefore, the court will analyze this case by focusing on the issue of pretext with the understanding that, as explained by the Seventh Circuit in the passage above, if Davis fails to establish pretext, then she has likewise failed to establish the second prong of her prima facie case.[5]

It is obvious from the presentation of the facts by both parties in this case that there were problems associated with Davis's performance.  Where the parties' opinions diverge, however, is over who is to blame.  For her part, Davis maintains that her supervisor, Marvin Persinger, did

---

[5]  The VA argues the matter both ways.  First, it argues that Davis cannot establish a prima facie case of race discrimination because she was not performing her job properly.  Then it argues, also, that Davis fails to even raise a fact issue as to the honesty of the VA's proffered, nondiscriminatory reason for firing her.

8

not raise job performance issues with her "at any point in time prior to March 12, 2003."

Plaintiff's Response, p. 3.  In fact, when Davis provided sworn testimony during the VA's EEO

investigation, she testified as follows:

> Q. [By EEO Investigator Tami Press]: What reason was given to you for terminating your appointment?
>
> A.  What's [sic] the reasons were?
>
> Q.  Uh-huh.
>
> A.  I was doing my job.  I never was late.  I always worked.  I hadn't missed a day, and they said I wasn't doing my job in an acceptable manner or something, yeah.
>
> Q.  Did your supervisor ever speak to you prior to this?
>
> A.  No he haven't.  No, he didn't.
>
> Q.  He never spoke to you about concerns regarding your performance?
>
> A.  Nope.

Plaintiff's Designation of Evidence, Docket at 31, Exhibit 1 (Affidavit of Rose Davis, September

8, 2003, p. 7).  So, Davis maintains that she was unaware of any problems with her job

performance until March 12, 2003, which is the date of her termination letter from the VA.

*See* Memorandum in Support, Exhibit B.  In that letter, the VA, through its Manager of Business

Support Services, Barry Baker, informed Davis that "[y]our supervisor has recommended [your]

termination due to your failure to perform assigned duties in an acceptable manner."  *Id.*

Davis's assertion that she was never told of any job performance problems is curious, to

say the least.  The evidence is replete with testimony and documentation that supports the VA's

position that Davis's work was substandard *and* that her supervisor worked with her personally

to attempt to help her improve.  That supervisor, Marvin Persinger, also testified during the EEO

investigation.  With regard to Davis's job performance, Persinger testified as follows:

> Q. [By EEO Investigator Press]: Can you please explain why Rose Davis'
> appointment was terminated?
>
> A.  Failure to perform her assigned duties in an acceptable manner.
>
> Q.  Can you give me some examples?
>
> A.  Yes.  She misfiled records.  She misfiled filing.  She did not charge out
> records properly.  She did not check in records properly.  She did not answer the
> phones properly.  Do you want me to go on?
>
> Q.  Well, let me ask you something, was this ever discussed with Rose Davis
> prior to her termination?
>
> A.  Many times.
>
> Q.  Okay.  She is stating that this is the–when she received that termination letter,
> that was the first time that she was made aware that her performance was poor.
>
> A.  I worked with Rose probably three months I think bending over backwards to
> train her.  She said that she was not being trained properly . . . so I would go up
> [to the Fort Wayne, Indiana, facility where Davis worked] a couple of times a
> week and work with her, and the other days I would bring her down here to work
> with her because she didn't feel like the ladies in the file room up there were
> treating her properly.

Memorandum in Support, Exhibit C, Affidavit of Marvin Persinger, pp. 3-4.  In addition to

Persinger's testimony, the VA has submitted the testimony of Jay Vandermark, who was the

Medical Business Office Manager and CFO for the VA Northern Indiana Health Care System.

With regard to Davis's job performance, Vandermark testified as follows:

> Q. [By EEO Investigator Press]: Can you please explain why Rose Davis was
> terminated from her temporary appointment?
>
> A.  Well, the reason for the termination was performance.  We were in the process
> of trying to get her trained and get her competencies to where we needed them for
> her temporary appointment, and we gave all the training that we could provide
> that we felt was necessary to let her learn her job, and then she was tested on
> several occasions, and was not able to perform the duties, so we took action to

terminate.

. . .

Q.  But were you aware that and [sic] had anybody discussed these poor performance issues with Ms. Davis at the time that she was still employed?

A.  I'm pretty sure she was, yes.  Marvin Persinger, the direct supervisor, was in contact with her, and we had several e-mails that I was on as well that indicated that she felt like initially she wasn't trained to do her job, and so we took the steps necessary to make sure she got the training necessary.  We actually took her even to the other campus.  We have two campuses here, and there is–Marvin is mainly out of the other campus, and so he would bring her down to that campus to have her train there.
. . .
And I think we tried to do what we could do to provide the training to make her an adequate employee to keep her, and it just didn't work out.

*Id*., Exhibit E, Affidavit of Jay Vandermark, pp. 3-4 and 7.  The e-mails referred to by

Vandermark during his testimony to the EEO officer were also submitted as evidence by the VA.

They include exchanges between Persinger and Vandermark regarding Davis and her job

performance.  *Id*., Exhibits H and O.  The exchange of these e-mails took place in January of

2003, a few months before Davis was fired.  They substantiate the testimony of both men, as

they contain inquiries from Vandermark about the progress being made with Davis, and

responses from Persinger indicating that he was working with Davis personally, both on the Fort

Wayne campus and the Marion campus.  They further substantiate Persinger's testimony that

Davis's job performance was inadequate and that steps were being taken to help her improve.

The VA also submitted the testimony of Brian Flynn, who was a Human Resources

Specialist with the Department, and who also testified during the EEO investigation in this case.

Flynn testified as follows:

Q. [By EEO Investigator Press]: Can you please explain to me why [Davis] was terminated?

11

A.  Well, as I understand it, and I did have a bit of some electronic communication that I was included in, although I didn't participate, I did read it, basically said that she was not performing up to the expectations of the position. That there was some issues with misfiling and unable to locate some documents and some files.  An effort was made by the supervisor to provide some additional training and had made–I guess Mr. Persinger, the supervisor had made some additional trips from the Marion campus to the Fort Wayne campus where Ms. Davis was employed to give her some one-on-one type training, and to give her a little extra guidance.  My understanding was that it seemed like the additional training did not have the desired effect.  It did not bring her up to speed, and there were several occasions of misfiling some of the records, and as a result, a decision was made to terminate her from her temporary appointment.

*Id*., Exhibit J, Affidavit of Brian Flynn, pp. 3-4.

It is certainly possible, one supposes, that neither Persinger nor anyone else at the VA ever *expressly* told Davis that her job performance was lacking.  But it strains credulity that she would maintain that she was never made aware of any problems when all the while she was apparently receiving additional training, testing, and personal attention at both the Fort Wayne and Marion facilities.  It is important to note that while Davis stated in her testimony that no one ever told her she had job performance problems, she does not deny that Persinger worked with her repeatedly both in Fort Wayne and in Marion.  It would certainly seem that under such circumstances any reasonable employee would realize that her job performance might be an issue.  Nonetheless, even giving Davis the benefit of the doubt on this point, as is proper when ruling on a motion for summary judgment, she still fails to establish that the VA was lying when it stated that the reason for her termination was poor performance.  Even assuming that no one at the VA actually told Davis to her face that her work was deficient, and assuming further that she did not have at the very least some sort of constructive notice of this under the circumstances, she does not present evidence to support her contention that the true reason for her termination was her race.  In addition, Davis does not allege that the VA should have, in some way, made her

12

directly and expressly aware that she was not performing her job adequately.  Nor does she

present any evidence (or even any argument) that similarly situated employees of a different race

were treated more favorably.  That is, Davis does not present evidence showing or tending to

show that a white employee in the file room with performance problems was not terminated, or

that such an employee was told directly and in no uncertain terms that he or she had performance

problems but were allowed to remain on the job anyway.  Obviously, such evidence would tend

to be incriminating against the VA.

  In addition to taking the position that no one at the VA ever alerted her to performance

problems, Davis also attempts to establish pretext by presenting evidence that she was not

treated well by her two white coworkers in the file room.  The facts concerning what occurred in

the workplace, according to Davis, also support her claim for race discrimination since they

reveal two important facts: 1) if there were in fact problems with her job performance, it was

because she was being "sabotaged" by her white coworkers; and 2) the VA fired her but took no

adverse action against her two white coworkers after being on notice that problems existed

between them in the Fort Wayne facility.

  Davis does present evidence that there was tension, if not outright animosity, between

herself and her white coworkers in the Fort Wayne facility.  In fact, this much is uncontested.

But Davis maintains that the situation between her and her coworkers amounted to racial

harassment and that the VA did nothing to remedy the situation.  Instead, she argues, the VA

fired her and took no action against her tormentors.  She concludes, therefore, that the real

reason for her termination was because she is black.  But that position is conclusory and highly

speculative, as is explained below.

In her Complaint, Davis characterized this situation as "harassing treatment . . . at the hands of two white co-workers, Lori Kennedy and Rachel Cutter."  Complaint, p. 2.  She further alleged that "this took place after several unanswered request[s] for help with this situation . . . ." *Id*.  Also, she alleged that she "was assaulted by Lori Kennedy (white female co-worker) . . ." and that as a result of this assault she "call[ed] the police and filed a report."  *Id*.  When asked about this situation during the EEO investigation, and why she believed her termination was racially motivated, Davis testified as follows:

> Q. [By Investigator Press]: . . . And why do you believe that your appointment was terminated because of your race?
>
> A.  Because the supervisor, he is Caucasian.
>
> Q.  Who is the supervisor?
>
> A.  Marvin Persinger.
>
> Q.  Okay.
>
> A.  Uh-huh.  And he was siding with Lori and Rachel Cutter, and he never did listen to what I had to say that what I was going through down there with them, and he was siding with them.  So that's why I say it was based on race.

Plaintiff's Designation of Evidence, Exhibit 1, Affidavit of Rose Davis, p. 6.  In her response to the present motion, Davis elaborates on the situation in the mail room.  She states in her response brief that she "was subjected to hostile workplace harassment by her fellow Caucasian employees.  These employees intentionally sabotaged Ms. Davis' work in an effort to make her appear incompetent.  Ms. Davis complained to her immediate supervisor about the treatment she received.  Although he was obviously aware of the problems Ms. Davis was experiencing with her fellow employees, the supervisor did nothing to discipline the Caucasian workers.  Rather, he chose to take sides with those workers."  Plaintiff's Response, pp. 1-2.  Also in her response,

14

Davis reiterates that approximately one month before she was terminated, she "was struck by a fellow temporary employee named Lori Kennedy in the file room." *Id.* Finally, Davis states that "Ms. Kennedy had a history of harassing Ms. Davis by, among other things, refusing to answer questions posed by Ms. Davis. . . . Indeed, both Ms. Kennedy and Rachel Cutter, another temporary file room employee who is also Caucasian, would give Plaintiff 'the silent treatment.'" *Id.*, p. 3.

In support of her contention that her white coworkers were sabotaging her work and harassing her, Davis points to the EEO investigation testimony offered by two other VA employees: Larry Wallace and Willa White, both of whom were African American employees who worked in the housekeeping department at the VA.

When asked about the situation involving Davis and her coworkers, Wallace testified as follows:

Q. [By EEO Investigator Press]: . . . To the best of your knowledge, why was Rose Davis terminated from appointment?

A. I didn't see–let me give you an example here. I had been working in the file room on light duty, and when I was working in there, I was observing the treatment she was receiving while she was in there. I was sorting some papers, some back file papers that needed to be sorted for–they went back for a couple of years. And when I sorted them, I stacked them in a certain way so when–for her to be able to follow, to make it quick for her to file them. . . . And when I first handed her the papers, the lady, one of the employees in there snatched the papers from her and hollered at her, you are not supposed to get those. Well, she is the one that is filing the papers. I didn't understand what was that all about, you know. And so I–it was–I sat there and listened to them talking about figuring out a way of getting her out of there.

Q. Who was talking about trying to get her out of there?

A. The lady that works in the file room, the one she is accusing. I can't think of her name.

Q.  Are you referring to Lori Kennedy or Rachel Cutter?

A.  Right, they was discussing that, yeah, right, those two.

Q.  Okay.

A.  And I sit there and listened.  I said wow.  Now, I could understand if she was doing something wrong, but for them to intentionally, to me, plot, that's why as a former union rep, that's why I would take it as a plot, to bring her down for no reason.  I didn't see no reason for them to be that way towards her.

Plaintiff's Designation of Evidence, Exhibit 4, Affidavit of Larry Wallace, pp. 4-5.  Wallace went on to testify that at some later point in time, someone rearranged the stacks of filing he had arranged as an accommodation to Davis, thereby interfering with her ability to accomplish the task of filing them in an efficient manner.  *Id*., p. 6.[6]

The other employee, Willa White, also testified during the EEO investigation.  The relevant portion of her testimony was as follows:

Q. [By EEO Investigator Press]: . . . What knowledge do you have regarding [Davis's] termination?

A.  As far as her termination, well, I was in there cleaning one day and I heard someone call someone's name, so I answered to it, and she said, well, I wasn't talking to you.  She said I was talking to Lori, but Lori wouldn't respond to her.  So as far as the mistreatment, the mistreated–I saw the mistreatment there.  Lori wouldn't respond to her.

*Id*., Affidavit of Willa White, Exhibit 5, p. 3.  According to Davis, the statements of Wallace and White provide evidence to support her position that she was subjected to "harassment" in the

_____

[6]  While he admitted he never heard anyone make derogatory comments about Davis's race, Wallace went on to testify at some length about his perceptions of race discrimination within the VA and his first-hand knowledge of it as a result of his work as a union representative.  Affidavit of Larry Wallace, pp. 10-12.  None of this testimony appears to have any link to Davis or her termination.  Such subjective opinion and "speculation as to the thoughts of the decision maker [are] irrelevant to an inquiry of race discrimination."  *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1062 (7th Cir. 2003).

16

workplace by her two white coworkers.

In addition, as stated previously, Davis contends that on one occasion she was assaulted by Kennedy.  Complaint, p. 1; Plaintiff's Response, p. 2.  Other than making this allegation, Davis does not elaborate about this incident at all, either in her briefing or her testimony to the EEO investigator.  As for her testimony, she makes only a passing reference to "the day that I was struck by Lori Kennedy in the file room, and I called the VA police to give testimony of what happened and everything . . ."  *Id*., Affidavit of Rose Davis, Exhibit 1, p. 5.  However, in the records of the EEO investigation submitted by the VA, it is revealed that the assault to which Davis refers consisted of "a coworker. . . pushing a chair against [Davis's] thigh . . . ."  Memorandum in Support, Exhibit N, Letter from Office of Resolution Management, p. 2.

These facts, according to Davis, establish that she was a victim of harassment, which she obviously perceived as racially motivated, at the hands of her coworkers.  However, Davis's own conclusions about these incidents, or her own subjective interpretation of what they meant, is just that–subjective and conclusory.  The only connection these incidents have to race is the fact that Davis is African American and her coworkers were Caucasian.  But even the testimony of Wallace and White, which Davis claims supports her position, casts doubt on whether the problems Davis was experiencing were truly racially motivated.  For example, White testified that "[Davis] feels it's because of her race, I, you know, I just go the feeling that they didn't–Lori didn't want her in there. . . . So I can't really say if it is because of her race or just the fact that she just didn't want her in there."  Memorandum in Support, Exhibit G, Affidavit of Willa White, pp. 3-4.  White further testified that she had no personal knowledge of Davis's work performance and that she never heard Lori Kennedy make any derogatory comments

17

regarding Davis's race.  *Id*., p. 4.  Larry Wallace also testified that he never heard anyone make any derogatory comments concerning Davis's race.  *Id*., Exhibit F, Affidavit of Larry Wallace, p. 10.  In addition, Wallace revealed in his testimony that Kennedy's ill treatment of Davis may have been motivated by something other than race.  Wallace testified that he "knew the issue of this Lori had been a temp or part-time or whatever, and she's trying to get in there full-time. And see with her, Ms. Davis being a veteran and being in that service before, you know, she out-pointed her as far as hiring wise.  So it was more or less like she was a block to her of getting that position permanent."  *Id*., p. 8.

With regard to the problems she was experiencing in the file room with her coworkers, Davis claims that the VA did nothing about it and that her supervisor, Persinger, always "sided" with her white coworkers.  However, the evidence reveals that the VA did, in fact, take at least some steps to address those problems.  For example, Janice Taylor-Pulido, who held the title of Manager of Health Information, testified that she was approached by Davis, either personally or through messages, "about some problems that [Davis] was having with her other employees." *Id*., Exhibit D, Affidavit of Janice Taylor-Pulido, p. 3.  Taylor-Pulido testified that she "talked to the group.  It was usually her and Rachel, and then her and Lori, and that was my–I tried to get them to understand each other better and work together better."  *Id*.  Taylor-Pulido further testified that "the first time I spoke with [Davis] and Rachel, and I told them to kind of get acquainted with each other, because most of it seemed like interpersonal conflicts, and I tried to get them to have some personal conversations, that way they get to know each other better, and I thought that would kind of ease it, and that seemed –I was given the lip service at least that they–that it was better, and the next day, it was something else and somebody else."  *Id*., pp. 4-5.

18

Davis does not dispute that Taylor-Pulido discussed with her and her coworkers the problems they were having working together.

Based on this evidence, it seems abundantly clear that there was indeed tension and infighting between Davis, Kennedy and Cutter.  But contrary to Davis's allegations on the issue, the VA did take at least some limited amount of action to deal with the situation.  And while the evidence also indicates that Davis may in fact have been the victim of some puerile and unprofessional behavior, it does not support her own conclusion that the problems were racially based.  In fact, Jay Vandermark, when asked by the EEO investigator about the problems the women were having in the file room, testified that "it was really kind of an unusual circumstance because . . . Lori [Kennedy] knew Rose when we hired her as a work study student, and she also was the one that recommended her to be hired for down there, and it turned out to be a whole different thing once she was down in the file room and working directly with Lori."  *Id.*, Affidavit of Jay Vandermark, Exhibit E, pp. 5-6.

Notwithstanding this evidence, Davis concludes that since she was terminated and Kennedy and Cutter were not, the termination must have been motivated by Davis's race rather than any other, legitimate reason.  But this conclusion requires a leap of faith that is not supported by the evidence submitted.  Instead, the evidence indicates that Davis had problems performing her job, whether or not she was directly and expressly told so.   And she and her two coworkers obviously had problems getting along at work, although the evidence is insufficient to establish that those problems had anything to do with race.  More importantly for the purposes of the VA's motion for summary judgment, the evidence is also insufficient to establish that the VA's proffered reason for terminating Davis was pretext for race discrimination, or to even raise

a genuine issue of fact in that regard.

It is well established that "self-serving speculations and conclusions are not enough to survive summary judgment." *Roszkowiak v. Baxter Healthcare Corp.*, 1998 WL 422284 (N.D. Ill.). "'[M]ere speculation as to the thoughts of the decision maker is irrelevant to an inquiry of discrimination.'" *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1062 (7th cir. 2003) (quoting *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 986 (7th cir. 2001)). Further, a coworker's general statements stating that plaintiff's job performance was satisfactory does not create a material issue of fact to whether or not plaintiff is meeting her employer's legitimate performance criteria." *Peele v. Country Mutual Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002). *See also, Rothman v. Emory University*, 123 F.3d 446, 453 (7th Cir. 1997) (a plaintiff's perceptions of an employer's motivations are ineffectual means of proving discrimination).

As stated previously, in order to establish that an employer's proffered nondiscriminatory reason for terminating an employee is pretextual, a plaintiff must put forth evidence that at least raises a fact issue about the genuineness of the employer's motives. This evidence must tend to show that the employer's proffered reason for taking such action is "a lie, specifically a phony reason for taking some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995). The issue is "whether the employer honestly believes in the reasons it offers." *Hague v. Thompson Distribution Company*, 436 F.3d 816, 824 (7th Cir. 2006) (citing *Grayson v. O'Neill*, 308 F.3d 808, 820 (7th Cir. 2002)). "To avoid summary judgment, a plaintiff must present evidence showing that the employer did not honestly believe his proffered reason." *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000). Stated another way, "[a] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion."

*Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997).  As the VA correctly states, "[m]erely casting doubt on an employer's stated reason for its employment decision is insufficient to establish pretext."  Memorandum in Support, p. 10 (citing *Crim v. Board of Educ. of Cairo School Dist. No. 1*, 147 F.3d 535 (7th Cir. 1998)) ("It is not sufficient to prove that the reason was doubtful or mistaken.") *Id*. at 541.

In this case, the evidence Davis presents in opposition to summary judgment falls woefully short of establishing a genuine issue of material fact with regard to the VA's proffered reason for terminating her.

## CONCLUSION

For the reasons discussed herein, the Motion for Summary Judgment filed by the Department of Veterans Affairs is GRANTED.

Dated: March 14, 2006.

  /s/   William C. Lee
William C. Lee, Judge
United States District Court

21